1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10   HENRY CASTIGNETTI,              )   No. SA CV 04-797-PJW
                                     )
11                  Plaintiff,       )
                                     )
12          v.                       )   MEMORANDUM OPINION AND ORDER
                                     )
13   JO ANNE B. BARNHART,            )
     Commissioner of the Social      )
14   Security Administration,        )
                                     )
15                  Defendant.       )
     _____)
16

17                                   I.

18                              INTRODUCTION

19        Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and

20   1383(c)(3), seeking reversal of the decision by Defendant Social

21   Security Administration ("Agency") denying Period of Disability

22   ("POD") and Disability Insurance Benefits ("DIB").  Alternatively, he

23   asks the Court to remand the case to the Agency for further

24   proceedings.  For the reasons discussed below, the decision of the

25   Agency is REVERSED and the case is REMANDED for further proceedings.

26
27
28

II.

BACKGROUND

Plaintiff was born on August 14, 1949, and was 53 years-old at the time of the relevant administrative hearing.  (AR 39, 87.)  He has a high school education and one year of college.  (AR 15, 34, 107.)  Plaintiff has past relevant work experience as a facility manager, consultant, and car rental manager.  (AR 15, 102.)

Plaintiff filed protectively for POD and DIB on September 5, 2001.  (AR 87-89.)  In his application, he alleged disability since December 1, 2000, because of irritable bowel syndrome ("IBS"), with symptoms of incontinence, uncontrolled diarrhea, and cramps.  (AR 15, 87, 101.)  He timely requested a hearing before an administrative law judge ("ALJ") after his claim was denied initially and on reconsideration.  (*See* AR 75-78, 81.)

The ALJ held a hearing on Plaintiff's application on November 21, 2002.  (AR 32-73.)  Plaintiff appeared with counsel and testified. (AR 39-58, 61-68.)  The ALJ also heard testimony from Alan Boroskin, a vocational expert.  (AR 58-61.)

Plaintiff testified that he first applied for disability benefits in the late 1980s, after having a nervous breakdown because of stress at work.  (AR 43-44.)  After receiving several months of psychiatric care, he withdrew that application and returned to work.  (AR 44, 62.)  Plaintiff managed a facility consulting business during the next decade, but began experiencing symptoms of IBS "early in the Spring of 1999" during periods of job stress.[1]  (AR 43, 53-54.)  He continued to

---

[1]  Plaintiff stated that his mother, a registered nurse, also had suffered from IBS for 30 years; according to him, "she just toughed it out and soiled herself on a regular basis."  (AR 52.)

2

work until November 2000, by which time he was "soiling [him]self on the job." (AR 40-41, 56, 58, 65-68.) When it became clear to his employer that Plaintiff would not return to work, he was terminated.[2] (AR 40-41.) Plaintiff explained that his uncontrolled IBS caused him to "have anywhere between six and a dozen bowel movements through early afternoon"--each of which would require at least one unscheduled break taking 20 to 30 minutes apiece--and added that his symptoms had not improved since he stopped working. (AR 50-51, 65.) Because of the uncontrollable nature of his IBS, Plaintiff doubted that he could perform any type of work, even out of his home. (AR 52.)

As to Plaintiff's treatment regimen, he stated that he had tried numerous medications for his IBS, including anti- and pro-biotics, but stated that "[n]one of them provided any relief and in many cases they exacerbated the problem." (AR 42, 48.) Tests conducted by various doctors also failed to pinpoint the problem, although he never required hospitalization.[3] (AR 44-45, 55.) Consequently, Plaintiff testified that he no longer took any medicine for his IBS symptoms and was no longer under a doctor's care for this problem, which he was told "could be caused by stress." (AR 41-42.) He added that he had not been prescribed any special diet, but stated that he had eliminated alcohol, caffeine, and dairy products from his diet. (AR 49-50, 56-57.) Plaintiff further admitted to using marijuana within

---

[2] He told the ALJ that his wife continued to work, and stated that he received all of the medical treatment his doctors recommended through her health insurance. (AR 48-49.)

[3] Plaintiff testified that he had been referred to a specialist at UCLA's Functional Bowel Disorders Clinic, but stated that he had yet to see that physician. (AR 45-48.)

1  the past six months.  (AR 63-64.)  At the time of the hearing,
2  Plaintiff was taking Paxil and Buspar for anxiety and depression, and
3  saw a psychiatrist on a monthly basis.  (AR 35, 41-42, 61-62.)

4      Plaintiff also testified at length about his daily activities.
5  He explained:

6      I get up usually between 7:00 and 8:00 in the morning.  I
7      watch the Today Show, have coffee, and I start doing
8      housework.  I do all the laundry, all the cleaning.  I
9      prepare all the meals.  I typically [. . .] can't leave the
10     house until early afternoon when my diarrhea starts to
11     settle down and typically then I don't go much further than
12     the supermarket a couple blocks away.

13 (AR 49.)  He added that he retained his driver's license, and that he
14 still could drive.  (AR 40.)  In addition, Plaintiff confirmed that he
15 managed his own funds, took care of his own grooming and hygiene, and
16 spent the remainder of his days reading, watching television,
17 listening to the radio, and talking with family and friends.  (AR 50.)

18     The ALJ next heard from Mr. Alan Boroskin, the vocational expert.
19 (AR 58-61.)  After comparing Plaintiff's prior work to the most
20 closely-analogous DOT categories, Mr. Boroskin noted that Plaintiff's
21 skills would not be transferrable to another occupation.  (*See* AR 58-
22 59.)  The ALJ then posed the first of three hypothetical questions to
23 this expert:

24     [Assume a person who] [c]an lift and stand without limits,
25     limited in standing and walking to six hours and sitting for
26     six hours cumulatively.  Can understand, carry out, and
27     remember simple instructions and complex instructions,
28     interact appropriately with co-workers, can respond

4

1          appropriately to usual work settings and such matters as

2          attendance, would not have a hard time adjusting to changes

3          in the work routine.

4   (AR 59.)   The vocational expert testified that this hypothetical

5   person could perform Plaintiff's past work.   (*See* AR 59.)   The ALJ

6   then posed his second hypothetical question:

7          [Assume] the same physical limitations [but also] mild

8          limitations in the ability to remember locations and work-

9          like procedures, work in coordination with and in proximity

10          to others without being distracted by them, interact

11          appropriately with the general public and get along with co-

12          workers or peers without distracting them or exhibiting

13          behavioral extremes, respond appropriately to changes in the

14          work setting, be aware of normal hazards and take

15          appropriate precautions, travel in unfamiliar places, set

16          realistic goals and make plans independently, and moderate

17          limitations in the ability to understand and remember

18          detailed instructions, carry out detailed instructions,

19          maintain attention and concentration for extended periods,

20          perform activities within a schedule, maintain regular

21          attendance and be punctual, complete a normal workday and

22          workweek without interruptions from psychologically-based

23          symptoms, and perform at a consistent pace without an

24          unreasonable number and length of rest periods, accept

25          instructions and respond appropriately with [*sic*] criticism

26          from supervisors.

27   (*See* AR 59-60.)   The expert testified that the "moderate limitations"

28   alone would preclude all work.   (AR 60.)   The ALJ's third hypothetical

question asked the vocational expert to assume only that the person would require "six to eight unscheduled breaks . . . of indeterminate duration" in the course of an eight-hour workday; Mr. Boroskin testified that this person also could not perform any work.  (AR 60-61.)  After a brief colloquy with counsel, the ALJ adjourned the hearing, leaving the record open to permit counsel to supplement it.  (*See* AR 68-72.)

On November 18, 2003, after analyzing Plaintiff's claims under the Agency's five-step sequential evaluation process, the ALJ issued a decision.  (AR 14-22.)  At step one, the ALJ concluded that there was no evidence that Plaintiff engaged in substantial gainful employment since December 1, 2000.  (AR 15.)  At steps two and three, the ALJ found that, although Plaintiff's IBS was "severe within the meaning of the Regulations," it was not sufficiently severe to meet or equal a Listing.[4]  (AR 17.)  After examining the medical record and explaining why Plaintiff's testimony about his limitations was not fully credible, (*see* AR 16-20), the ALJ assessed Plaintiff's residual functional capacity:

> [Plaintiff] retains the residual functional capacity for light work entailing lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and walking for six hours a day, and sitting for six hours a day.  He must have access to a nearby bathroom, and is restricted from climbing, and from working around hazards.  [He] is

---

[4]   Additionally, the ALJ found that Plaintiff suffered from "a mood disorder, depression, a compulsive personality disorder, and an adjustment disorder," but added that the evidence showed these to be non-severe impairments.  (AR 17.)

1  able to understand, carry out and remember simple

2  instructions, follow complex instructions, interact

3  appropriately with coworkers, respond appropriately to usual

4  work settings in matters such as attendance, and adjust to

5  changes in a work setting.

6  (AR 20.)  Relying on the vocational expert's testimony that a person

7  with these limitations could perform all of Plaintiff's prior work,

8  the ALJ made the step-four determination that Plaintiff was not

9  disabled at any time during the relevant period.  (AR 20.)

10  Plaintiff timely sought review of the ALJ's decision.  (AR 10.)

11  The Appeals Council denied review on May 6, 2004, however, and the

12  decision of the ALJ became the final decision of the Agency.  (AR 5-

13  7.)  Plaintiff then brought this lawsuit.

14  III.

15  STANDARD OF REVIEW

16  "Disability" under the applicable statute is defined as the

17  inability to perform any substantial gainful activity because of "any

18  medically determinable physical or mental impairment which can be

19  expected to result in death or which has lasted or can be expected to

20  last for a continuous period of not less than twelve months."  42

21  U.S.C. § 1382c(a)(3)(A).  The Court may overturn an ALJ's decision

22  that a claimant is not disabled only if the decision is not supported

23  by substantial evidence or is based on legal error.  *See Magallanes v.*

24  *Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

25  Substantial evidence "'means such relevant evidence as a

26  reasonable mind might accept as adequate to support a conclusion.'"

27  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison*

28  *Co. v. NLRB*, 305 U.S. 197, 229 (1938).)  It is "more than a mere

7

1  scintilla but less than a preponderance," *Tidwell v. Apfel*, 161 F.3d

2  599, 601 (9th Cir. 1998), and "does not mean a large or considerable

3  amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

4      "The Court must uphold the ALJ's conclusion even if the evidence

5  in the record is susceptible to more than one rational

6  interpretation." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595,

7  599 (9th Cir. 1999).  Indeed, if the record evidence can reasonably

8  support either affirming or reversing the Agency's decision, this

9  Court must not substitute its judgment for that of the ALJ.  *See*

10  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  If the ALJ

11  committed error but the error was harmless, reversal is not required.

12  *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th

13  Cir. 2003)(applying the harmless error standard).

14                                    IV.

15                                DISCUSSION

16      Plaintiff does not dispute the ALJ's finding that he retains the

17  *exertional* capacity for light work.  He does, however, disagree with

18  the ALJ's determination that his unusual, *non-exertional* limitation--

19  specifically, his need to take six or more unscheduled bathroom breaks

20  during the course of a normal workday because of his chronic diarrhea-

21  -does not foreclose his former work.  (*See* Joint Stip. at 5.)  To that

22  end, Plaintiff contends that the ALJ erred in four ways.  First,

23  Plaintiff argues that the ALJ did not properly address the credibility

24  of his testimony or of his wife's written statement.  (*See* Joint Stip.

25  at 16-19, 21-22.)  Second, Plaintiff insists that the ALJ did not give

26  due consideration to the evidence of the frequency and duration of his

27  uncontrollable bowel movements.  (*See* Joint Stip. at 3-6, 10-12.)

28  Third, Plaintiff maintains that ALJ gave short shrift to the opinions

                                    8

1    of four treating physicians.  (*See* Joint Stip. at 12-14, 16.)  Fourth,

2    and finally, Plaintiff argues that new and material evidence requires

3    remand.  (*See* Joint Stip. at 22-24, 25.)

4         Each of Plaintiff's specific arguments will be addressed in the

5    order listed above, which differs slightly from the order he has

6    briefed them.  For the reasons set forth below, the Court finds that

7    the ALJ's credibility findings were improper, and not supported by

8    substantial evidence.  This error permeates the entire decision and

9    tainted the ALJ's evaluation of the medical evidence, including the

10   opinions of Plaintiff's treating physicians.  Because further factual

11   development of the record is necessary, the matter will be remanded

12   for further proceedings.

13   A.   The ALJ's Adverse Credibility Finding

14        Plaintiff first faults the ALJ for finding his complaints about

15   the severity of his chronic diarrhea to be not credible.  (*See* Joint

16   Stip. at 4-8.)  Subsumed within this challenge is Plaintiff's related

17   claim that the ALJ did not give sufficient consideration to the

18   medical evidence of the frequency and duration of his bowel movements.

19   (*See* Joint Stip. at 1-16, 10-12.)  Upon reviewing the record, the

20   Court concludes that the ALJ's credibility findings were fatally

21   flawed, and that this error led the ALJ to downplay the evidence of

22   the frequency and duration of Plaintiff's subjective symptoms.

23        "Credibility determinations are the province of the ALJ."  *Fair*

24   *v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).  An ALJ may reject a

25   claimant's testimony as not credible by specifically identifying the

26   incredible testimony and by identifying the evidence that undermines

27   that testimony.  *See Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.

28   1996).  As long as substantial evidence in the record supports the

ALJ's credibility finding, this Court may not second-guess it.  *See Morgan*, 169 F.3d at 600.  The Court will not reverse an ALJ's credibility determination based on contradictory or ambiguous evidence.  *See Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).

     The Ninth Circuit recognizes that pain testimony is difficult to weigh because "pain is a highly idiosyncratic phenomenon, varying according to the pain threshold and stamina of the individual victim." *Howard v. Heckler*, 782 F.2d 1484, 1488 (9th Cir. 1986).  More expansively, the circuit has observed:

> Unlike most medical conditions capable of supporting a
> finding of disability, pain cannot be objectively verified
> or measured . . . .  [T]he very existence of pain is a
> completely subjective phenomenon.  So is the degree of pain:
> The amount of pain caused by a given physical impairment can
> vary greatly from individual to individual.

*Fair*, 885 F.2d at 601.  Although *Howard* and *Fair* are couched in terms of pain symptoms, the Ninth Circuit has recognized that the analysis these cases prescribed applies to any subjective symptom testimony. *See Batson*, 359 F.3d at 1195-96.

     The inherent difficulty in evaluating another person's experience of subjective symptoms has led the Ninth Circuit to require the ALJ to undertake a two-step analysis when considering a claimant's symptom testimony.  First, the ALJ must examine the evidence to determine whether the claimant has met his burden of producing objective medical evidence of an impairment, *and* of showing that the impairment reasonably could be expected to produce a symptom.  *See Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996).  As will be explained below, the Court finds that the ALJ did not properly determine whether

1  Plaintiff's impairment reasonably could cause the limitations he
2  claimed; instead, he proceeded directly to the credibility
3  determination.  (*See* AR 18.)    Thus, the ALJ skipped the first *Smolen*
4  step.

5      The second step requires the ALJ to assess the claimant's
6  credibility as to the severity of his pain or other subjective
7  symptoms.  *See Smolen*, 80 F.3d at 1282.    Although the claimant must
8  produce medical evidence of an underlying impairment reasonably likely
9  to be the *cause* of his alleged symptom, he is not required to submit
10  medical findings to substantiate the *severity* of his symptoms.  *See*
11  *Drouin v. Sullivan*, 966 F.2d 1255, 1258 (9th Cir. 1992).    Rather, a
12  claimant's testimony concerning the severity of her pain or other
13  symptoms can only be rejected for specific, clear, and convincing
14  reasons.  *See Drouin*, 966 F.2d at 1258; *see also Lester*, 81 F.3d at
15  834 ("For the ALJ to reject the claimant's complaints, [the ALJ] must
16  provide specific, cogent reasons for the disbelief.")(internal
17  quotation marks and citation omitted).

18      The ALJ reached the second *Smolen* step, offering three general
19  reasons for discounting the credibility of Plaintiff's testimony.
20  (*See* AR 18.)    As will be explained below, however, none of the three
21  reasons the ALJ relied upon is sufficient to support his adverse
22  credibility determination.

23      1.   Consistency With Medical Evidence

24      In Plaintiff's case, although the ALJ did not explicitly perform
25  the first *Smolen* step, he began his credibility assessment by
26  expressing his doubts that Plaintiff's chronic diarrhea could produce
27  the severity of the symptoms he alleged.  The ALJ stated:

28

11

1         The [ALJ] has considered [Plaintiff's] testimony and

2         statements of record as to persistent and uncontrollable

3         diarrhea predominantly in the morning hours, incontinence,

4         gas, bloating, pain and cramping unresponsive to all medical

5         management and prohibiting the performance of all gainful

6         work.  The undersigned cannot find [him] credible because of

7         significant inconsistencies in the record as a whole.

8         Particularly of note is the absence of weight loss, wasting

9         or other nutritional deficits as a result of chronic

10        diarrhea.  Physicians examining [Plaintiff] have described

11        him as being well nourished and in no distress, and in fact,

12        have characterized him as being mildly obese.  A

13        longitudinal review of the record confirms that [his] weight

14        has remained stable and that he actually gained weight.  As

15        referenced herein, the physical examinations and diagnostic

16        studies of record have largely been unremarkable apart from

17        [Plaintiff's] subjective assertions as to the circumstances,

18        extent and frequency of his bowel disorder.  At least one

19        physician commented that the frequency of his bowel

20        movements had not been verified.

21  (*See* AR 18 (citations to record omitted).)  Although the portions of

22  the record that the ALJ cited supports his finding that Plaintiff's

23  weight remained relatively stable, that doctors could not ascertain

24  the cause of his chronic diarrhea, and that the frequency of his bowel

25  movements had not been verified, (*see* AR 272, 278, 281), the ALJ's

26  credibility finding cannot be upheld on these bases.

27

28

Although the medical record lacks evidence of drastic weight loss,[5] there likewise is no evidence in the record that such weight loss necessarily accompanies chronic diarrhea.  The physicians who treated and examined Plaintiff all noted his weight.  (*See* AR 157, 174, 220, 272, 281.)  Despite his weight, all of Plaintiff's physicians agreed that he suffered from chronic diarrhea, and none cited his weight as offering any reason to doubt that his diarrhea symptoms were as severe and uncontrollable as he had alleged.  (*See* AR 154, 178, 195, 199, 223, 275-76, 284.)  The ALJ, on the other hand, concluded that Plaintiff's relative weight stability was somehow inconsistent with chronic diarrhea, at least to the extent that he claimed it.  (*See* AR 18.)  Although this may or may not be a fair conclusion, it is a *medical* conclusion: one Plaintiff's own doctors did not reach.  That being so, "the ALJ may not substitute his own opinions for the opinions of a physician by reaching his own conclusions about the evidence." *Neumeyer v. Barnhart*, No. EDCV 04-1079-JWJ, 2006 WL 39079, at *10 (C.D. Cal. Jan. 5, 2006)(citation omitted); *see also Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).

Nor was the ALJ's observation that doctors had been unable to pinpoint the cause of Plaintiff's chronic diarrhea a proper reason for finding his subjective symptom testimony to be incredible.  Although the "unremarkable" diagnostic studies left Plaintiff's treating physicians mystified as to the cause of his chronic diarrhea, and although one doctor observed that the frequency of Plaintiff's bowel

---

[5]  The ALJ's summarization of the evidence is, on this point, selective.  There is some evidence that Plaintiff initially lost 25 pounds as a result of his IBS.  (*See* AR 157, 220.)

1   movements could not be verified outside an in-patient setting, (*see* AR

2   278), no doctor ever doubted that Plaintiff actually had chronic

3   diarrhea, or that it caused symptoms of the severity he alleged. (*See*

4   AR 153-55, 197-98, 201, 220-25, 277-78.) Contrariwise, a consulting

5   physician specifically found that the treating physicians' medical

6   diagnostic impression of chronic diarrhea "could reasonably cause the

7   alleged symptoms and is partially credible," and that Plaintiff's

8   diarrhea was "debilitating," notwithstanding its "unclear etiology."

9   (*See* AR 186.) An ALJ may not reject a claimant's subjective

10  complaints merely because the extent and severity of his symptoms

11  cannot be supported by objective medical evidence. *See Drouin,* 966

12  F.2d at 1258; *see also Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th

13  Cir. 1991)(*en banc*)(citation omitted). That is precisely what the ALJ

14  did here. (*See* AR 18.)

15      In sum, the two-step analysis set forth in *Smolen* is designed

16  such that, first, an ALJ must consider whether there is medical

17  evidence of an illness that could cause symptoms and, second, only if

18  so must the ALJ determine whether the claimant's subjective symptom

19  complaints are credible. *See Smolen*, 80 F.3d at 1281-82. The risk an

20  ALJ runs when he skips the first step is that he may impermissibly

21  blend the analysis. That is exactly what occurred when the ALJ cited

22  weaknesses in the medical evidence about the *existence* of an

23  impairment to gauge the *severity* of symptoms caused by that

24  impairment.

25      2.  Motivation To Work

26      The ALJ also relied upon an examining physician's questions about

27  Plaintiff's motivation to work in reaching his adverse credibility

28  determination. The ALJ reasoned:

1
2
3
4
5

As to other observations by examining physicians, Dr. Bain
commented following his January 2003 evaluation that it did
not appear to him that [Plaintiff] was motivated to return
to work, nor did it appear that [he] was interested in
considering other work or perhaps working at home.

6
7
8

(*See* AR 18 (citation to record omitted).)  Although an ALJ's
consideration of a claimant's motivation to work is proper in the
abstract,[6] it was not supported by substantial evidence here.

9
10
11
12
13
14
15
16
17
18

One examining physician--who, significantly, examined Plaintiff
while his diarrhea was uncontrolled--noted that Plaintiff did not *then*
appear to be motivated to return to his old job and seemed
disinterested in seeking retraining.  (*See* AR 276-77.)  Given that
Plaintiff's diarrhea was *not* controlled, however, the examining
physician ultimately credited Plaintiff's subjective symptom
complaints, and concluded that he was "unable to perform his work
because of the need to be frequently and immediately near a toilet."
(AR 278.)  At the hearing, the ALJ questioned Plaintiff on his
willingness to work:

19
20

Q.   *Do you think you could do any type of self-employment
now* working out of your home?

21

A.   That would be difficult.  I don't believe I could.

22

Q.   Why not?

23
24

A.   Because of the time it would require on-site.  It's not
that I couldn't work at the computer at the house.  It

25

26
27
28

    6   *See Reyes v. Sullivan*, No. CV 91-1467(E), 1991 WL 319031, *2
(C.D. Cal. Dec. 3, 1991)(noting that an ALJ could consider a
claimant's evident lack of motivation to work when weighing his
credibility because "[t]he ordinary techniques of credibility
evaluation include consideration of a witness' motivation").

1              would be making appointments, meeting clients, being in

2              vacant buildings.  That would be difficult.

3         Q.   Okay.  Do you think you could do any type of work?

4         A.   That's a good question.  I've been rattling my brain,

5              trying to figure out, you know, what I can do.  I

6              mean--and I can't figure out anything.  I--jokingly,

7              you know, the attendant at a Vegas men's room would be

8              an ideal job.  But short of that--

9    (AR 52 (emphasis added).)  Although the examining physician ultimately

10   concluded that Plaintiff could not work, the ALJ reached the opposite

11   conclusion, evidently because of Plaintiff's responses to questions

12   about his ability to work.  (*See* AR 18.)

13        The Court finds that the ALJ's conclusion was erroneous.  It

14   bears emphasis that Plaintiff's symptoms were uncontrolled on both of

15   the occasions that he was asked about his willingness to work *at those*

16   *times*.  (*See* AR 50-52, 276-78.)  Neither the examining physician nor

17   the ALJ probed Plaintiff's motivation to work if his symptoms could be

18   brought under control.  As such, it is impossible to ascertain whether

19   Plaintiff's motivation to work affected his reporting of his

20   disability, or "his disabilities [themselves] diminish his work

21   motivation."  *See McLean v. Barnhart*, No. 02-4085-JAR, 2004 WL

22   1212045, at *5 (D. Kan. May 20, 2004); *see also Stempien v. Barnhart*,

23   No. C 01-01521 WHA, 2002 WL 31499000, at *4-*5 (N.D. Cal. Oct. 30,

24   2002)(finding that an ALJ's adverse credibility determination

25   improperly relied on his finding that a claimant with chronic,

26   uncontrollable diarrhea was unmotivated to work, where the claimant

27   had been a model employee before her disability and where her lack of

28

                              16

1  motivation could be attributed to the uncontrollable nature of her

2  diarrhea, but affirming the credibility determination on other

3  grounds).

4       The Court's conclusion that the ALJ erred is reinforced by the

5  fact that the ALJ's reliance upon Plaintiff's apparent lack of

6  motivation to work flies in the face of substantial evidence of

7  record.   Other doctors reported that Plaintiff seemed "eager to work,"

8  (*see* AR 247), memorialized his feeling that he had "traded the stress

9  of work for the stress of being out of work," (AR 206, 230), opined

10  that he remained "very interested in his usual occupation," and noted

11  that he said he would "return to work tomorrow if his diarrhea

12  stopped."[7]  (AR 313-14.)   In addition, Plaintiff has a long and mostly

13  continuous history of gainful employment.   (*See* AR 93-99, 208-09, 240-

14  42.)   Where, as here, the ALJ's credibility finding rests upon

15  selective, unrepresentative citations to the record, the finding

16  cannot stand.  *See Holohan v. Massanari*, 246 F.3d 1195, 1203-05 (9th

17  Cir. 2001)(reversing an adverse credibility finding and remanding for

18  an award of benefits where the ALJ selectively quoted a doctor's

19  records out of context).

20       In the particular circumstances of this case, the Court concludes

21  that the ALJ's finding that Plaintiff lacks motivation to work is not

22  based on a fair reading of the evidence of record, and flies in the

23  face of substantial evidence to the contrary.   Accordingly,

24  Plaintiff's supposedly lukewarm motivation to work cannot sustain the

25  ALJ's adverse credibility assessment.

26  _____

27       [7]  Although this last evidence post-dates the decision, it was
considered by the Appeals Council when it denied review.  (*See* AR 5,

28  8, 310-20.)

17

1           3.   Daily Activities

2           Finally, the ALJ found Plaintiff's level of activity to be

3   inconsistent with his claim of total disability.   He explained:

4           In spite of his disorder, [Plaintiff's] statements of record

5           reflect that he leads an active lifestyle.   In addition to

6           the aforementioned activities, [he] reports that he does

7           routine errands such as shopping at a home improvement store

8           and going for a haircut.   He is also reportedly involved in

9           a project of installing a large-scale model railroad in his

10          backyard and spends time in designing the track layout and

11          elevating his backyard.   According to the descriptions in

12          the record, the railroad is quite elaborate, and has

13          involved bringing in 36 tons of dirt and includes mountains

14          and bridges.   When not involved in this particular activity,

15          [Plaintiff] relates that he has done numerous home repairs,

16          painting jobs, and planting jobs in his garden.   [He]

17          frequently visits with a friend for coffee and a chat.   He

18          has future plans of taking a seven-day trip with his wife

19          for their anniversary.   In all, his activities are not

20          consistent with a debilitating illness.

21  (See AR 18 (citations to record omitted).)   In light of the particular

22  nature of Plaintiff's impairment, the Court concludes that Plaintiff's

23  level of occasional activity was an improper reason for the ALJ to

24  reject his credibility.

25          It is well-established that the ALJ may consider a claimant's

26  daily activities when making credibility determinations.   Indeed, "the

27  ALJ may reject a claimant's symptom testimony if the claimant is able

28  to spend a substantial part of her day performing household chores or

other activities that are transferable to a work setting." *See Smolen*, 80 F.3d 1284 n.7; *see also Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995)(noting that "[a]n ALJ is clearly allowed to consider the ability to perform household chores" when assessing a claimant's degree of limitation); *Fair*, 885 F.2d at 603.

The Ninth Circuit has made clear, however, that the key word is "daily." In *Vertigan v. Halter*, 260 F.3d 1044 (9th Cir. 2001), the ALJ had rejected the claimant's pain testimony as inconsistent with her ability to "go grocery shopping with assistance, walk approximately an hour in the malls, get together with her friends, play cards, swim, watch television, and read," as well as exercise at home and undergo six months of physical therapy. *Id.* at 1450. The Ninth Circuit found this was improper, stating:

> [T]hese physical activities did not consume a substantial part of Ms. Vertigan's day. This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled. In addition, activities such as walking in the mall and swimming are not necessarily transferable to the work setting with regard to the impact of pain. A patient may do these activities despite pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain or could engage in similar activity for a longer period given the pain involved.

*Vertigan*, 260 F.3d at 1049-50 (citation and internal quotation marks omitted).  In Plaintiff's case, there is no evidence that *any* of the activities the ALJ relied upon consumed a substantial part of Plaintiff's day.  (*See* AR 18.)

Perhaps more importantly, Plaintiff's ability to perform these activities between bouts of diarrhea was not germane to the ALJ's adverse credibility finding because those activities were not translatable into a work-setting that presumes relatively few breaks. Plaintiff freely admits that he retains the exertional capacity to perform light work when he is not debilitated by his symptoms.  (*See* Joint Stip. at 5.)  These activities do not, however, offer any support for the ALJ's finding that Plaintiff could perform a full-time job without excessive absences and breaks to attend to his symptoms of diarrhea and incontinence.  Indeed, it is apparent that Plaintiff performs his activities until his symptoms subside in the early afternoon, (*see* AR 49, 113, 206, 248), or "when he feels able" to do so.  (*See* AR 121.)  In these circumstances, the extent of Plaintiff's activities were not a sufficient basis for finding his testimony incredible.  *See Smolen*, 80 F.3d at 1284 n.7 (noting that "many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically").

Ultimately, although Plaintiff's activities at home may be inconsistent with a claim of disabling *exertional* limitations, the ALJ did not explain how those activities in any way contradicted Plaintiff's assertion that the *non-exertional* limitation caused by his chronic diarrhea--namely, his need to be in a restroom dealing with his symptoms at unpredictable intervals at least six times per day for

up to half an hour at a time--precluded all work.[8]  This was error.[9]
*See Gonzalez v. Sullivan*, 914 F.2d 1197, 1200-01 (9th Cir.
1990)(holding where ALJ found claimant could perform sedentary work
and referred to claimant's daily activities, ALJ erred by not stating
how "ability to perform those daily activities translated into the
ability to perform appropriate work").  Accordingly, the ALJ must
revisit the issue of Plaintiff's credibility on remand.

     Within his challenge to the ALJ's credibility analysis, Plaintiff
contends that the ALJ erroneously ignored a Daily Activities
Questionnaire completed by his wife, Diane R. Castignetti. (*See* Joint
Stip. at 19.)  A review of the record reflects that Mrs. Castignetti

_____

     [8]  *See Crowley v. Apfel*, 197 F.3d 194, 198-99 (5th Cir. 1999)
(finding that a claimant's bowel incontinence was a non-exertional
impairment under the Act).

     [9]  The ALJ's faulty credibility analysis subsumes Plaintiff's
claim that the ALJ failed to address the evidence of the frequency and
duration of his uncontrollable bowel movements, notwithstanding that
Plaintiff has briefed the two issues separately. (*See* Joint Stip. at
3-6, 10-12.)  Although Plaintiff frames this issue as a challenge to
the ALJ's handling of the *medical* evidence, (*see* Joint Stip. at 3),
the Court notes that--insofar as Plaintiff's testimony was the source
of all of the evidence in the record concerning the frequency and
duration of his bowel complaints at the time the ALJ reached his
decision--the Court's finding that the ALJ's credibility analysis was
flawed makes the resolution of this issue a foregone conclusion. (*See*
Joint Stip. at 9, *see also* AR 154, 156, 174, 181, 198, 204, 217, 223,
268.)  On remand, the ALJ is reminded that he must consider "all of
the evidence presented," including evidence of the "duration [and]
frequency" of the claimant's subjective symptoms and other factors
concerning the claimant's functional restrictions due to such
symptoms.  *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  If the ALJ
still intends to deny benefits on the ground that Plaintiff's IBS
symptom complaints are unsubstantiated, he must "explain *what*
objective or other evidence," if any, leads him to conclude that
Plaintiff's "bowel symptoms were not severe enough to prevent him from
working on a regular and continuing basis."  *See Nickola v. Barnhart*,
No. 03-C-622-C, 2004 WL 1243742, at *3 (W.D. Wis. June 7, 2004)
(emphasis in original).

did indeed complete a questionnaire that corroborated Plaintiff's account of his symptoms in many respects, (*see* AR 119-24), and that the ALJ did not mention this questionnaire in his decision.  (*See* AR 14-22.)  This oversight was improper.  "[L]ay witness testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence, and therefore *cannot* be disregarded without comment."  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (italics in original and internal citations omitted).  On remand, the ALJ must give specific consideration to Mrs. Castignetti's responses to the questionnaire; if he intends to discount her responses, he must set out reasons germane to her testimony in his new decision.  *See Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

B.   <u>The Medical Evidence</u>

Plaintiff next claims that the ALJ did not properly address the opinions of four treating physicians--all of whom concluded that Plaintiff was unable to work.  (*See* Joint Stip. at 13-14, 16.)  The Court agrees.

A treating physician's opinion as to the nature and severity of an impairment deserves controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(d)(2).  The ALJ must offer specific and legitimate reasons to reject the opinions of treating physicians.  *See Holohan*, 246 F.3d at 1202-03; *Lester*, 81 F.3d at 830 (same).  A treating physician's opinion on the ultimate issue of disability must itself be credited unless it can be rejected for clear and convincing reasons.  *See Holohan*, 246 F.3d at 1202-03.  Acceptable "reasons for

22

rejecting a treating doctor's opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion." *Reddick*, 157 F.3d at 725.

An ALJ is not invariably required to give controlling weight to the opinion of a treating physician, however. *See Batson*, 359 F.3d at 1194-95. "Although a treating physician's opinion generally is afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). "The ALJ may disregard the treating physician's opinion whether or not that opinion is contradicted," and "need not accept a treating physician's opinion . . . with little in the way of clinical findings . . . ." *See Magallanes*, 881 F.2d at 751; *see also Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)(noting that the ALJ need not accept a treating physician's opinion that is brief, conclusory, and unsubstantiated by objective medical evidence).

A review of the record reflects that, beginning in 2000, Plaintiff underwent a battery of tests--including some at the Mayo Clinic--to determine the cause of his IBS symptoms. (*See* AR 138-51.) In his quest for a diagnosis, Plaintiff underwent a "hydrogen breath test" and a pair of EGDs, as well as "CT scan, manometer, stool collection, and several blood chemistry readings"; additionally, Plaintiff had two colonoscopies, including colonic and small bowel biopsies. (*See* AR 157, 206.) In addition, Plaintiff had an internal medicine evaluation, an EKG, a CXR, as well as "x-rays, [a] full blood-workup and [testing of his] urine sample, and a complete physical examination." (AR 153, 196, 228.)

When these tests failed to shed light on the cause of Plaintiff's bowel complaints, Dr. C. Gregory Albers, M.D., a gastroenterologist who treated Plaintiff in 2001, administered an array of pharmacological treatments; none of these provided relief of Plaintiff's symptoms. (*See* AR 153-56.) During this phase of his illness, Plaintiff evidently was prescribed 22 different medications; none provided lasting relief. (AR 228.) More laboratory tests were ordered; these yielded no new insight into the cause of Plaintiff's symptoms. (AR 166-71.) Ultimately, Dr. Albers diagnosed Plaintiff with IBS, and opined that he was disabled. (*See* AR 222.)

Dr. Jens W. Dimmick, M.D. saw Plaintiff beginning in 2002. (*See* AR 194-96, 312-27.) After attempts to medicate the problem had failed, Dr. Dimmick concluded that Plaintiff was "temporarily totally disabled" because his IBS had proved "non-responsive to treatment." (AR 194-95.)

Plaintiff received treatment from Dr. Michael J. Santoro, M.D., another gastroenterologist; this doctor noted that Plaintiff "goes to the bathroom constantly" and admitted that he had been "unable to locate [the] cause or [an] effective treatment." (*See* AR 223-25.) Finally, Dr. David R. Zachary, M.D., saw Plaintiff in 2002; although he conducted no further testing or treatment--noting the "extensive testing" and "multiple therapeutic trials" that already had been done, and opining that "to my knowledge we have exhausted available resources--he also concluded that "[i]n spite of his physical capacity, [Plaintiff] is unable to be constantly in a public setting," and emphasized that, although Plaintiff retained the physical capacity to work, "there would be frequent disruptions and the need for immediate access to a toilet." (AR 198-99.)

In his decision, the ALJ acknowledged all four of these treating physicians' opinions, but suggested that he was rejecting or discounting those opinions because they relied upon Plaintiff's subjective symptom complaints, which had already been found to be not credible.   The pertinent portion of the ALJ's opinion reads:

> On February 16, 2001, Dr. Santoro reported that [Plaintiff] was disabled due to diarrhea and the need to go to a restroom constantly.  Dr. Albers has reported that [Plaintiff] is disabled due to [IBS] with frequent diarrhea, incontinence, and abdominal pain.  He has also indicated that [Plaintiff] needs to be near a toilet, and that he had restrictions against bending, lifting more than 10 pounds, or being around stress.  On April 3, 2002, [Dr.] Zachary reported that [Plaintiff] was unable to be consistently in a public setting due to uncontrollable explosive diarrhea and frequent soiling.  [Dr.] Dimmick indicated that [Plaintiff] was disabled with uncontrollable diarrhea, abdominal cramps which left him sweating, depress[ed], and ang[ry].  Objectively, Dr. Dimmick noted a marked increase in bowel sounds.

(AR 19 (citations to record omitted).)   The ALJ then stated that he would discount all of these opinions, and explained why:

> These physicians did not elaborate on specific findings which as diagnostic studies would support the purported inability to maintain activities on a sustained basis during the day.  While a debilitating condition was reported due to frequent diarrhea, incontinence, abdominal pain and foul smelling gas, their statements overall suggested that they

25

1    relied primarily on [Plaintiff's] subjective complaints.

2    Further, the functional capacity by Dr. Albers that

3    [Plaintiff] was precluded from bending or lifting more than

4    10 pounds seemingly exceed [Plaintiff's] own acknowledged

5    activities.

6   (AR 19 (citations to record omitted).)   Thus, although the decision is

7   not entirely clear on this point, the ALJ appears to have rejected or

8   discounted the treating physicians' opinions because they appeared to

9   rely on Plaintiff's subjective symptom complaints rather than

10  "specific findings."   (*See* AR 19.)   This was improper.

11       Where an ALJ supports his adverse credibility determination with

12  specific, clear, and convincing reasons, as required by *Smolen*, he is

13  free to discount or disregard a treating physician's opinion to the

14  extent it was premised on Plaintiff's subjective complaints.   *See*

15  *Tonapetyan*, 242 F.3d at 1149; *see also Morgan*, 169 F.3d at 602 (noting

16  that "a physician's opinion of disability premised to a large extent

17  upon the claimant's own accounts of his symptoms and limitations may

18  be disregarded where those complaints have been properly

19  discounted")(citations and internal quotation marks omitted).   But the

20  converse is also true: where an ALJ's adverse credibility finding does

21  *not* satisfy *Smolen*, he must articulate "specific and legitimate

22  reasons"--above and beyond his disbelief of Plaintiff--for rejecting

23  the opinions of his treating physicians.   *See Benecke v. Barnhart*, 379

24  F.3d 587, 594 (9th Cir. 2004)(concluding that the ALJ "erred in

25  discounting the opinions of [the claimant's] treating physicians [by]

26  relying on his disbelief of [the claimant's] symptom testimony," where

27  the ALJ's adverse credibility finding did not satisfy *Smolen*).

28

Here, putting aside the ALJ's improper reliance upon his adverse credibility determination, the only other basis for his dismissal of the opinions of *all four* of the treating physicians is that *one* of those physicians--Dr. Albers--had made a residual functional capacity assessment that appeared to be more conservative than Plaintiff's complaints would warrant. (*See* AR 19.)  This was unsatisfactory.  The ALJ has a duty to evaluate every medical opinion he receives.  *See* 20 C.F.R. § 404.1527(d).  In the course of that evaluation, "an ALJ must make specific findings as to why [he] is rejecting a treating physician's opinion." *See Katz v. Secretary of Health & Hum. Servs.*, 972 F.2d 290, 293 (9th Cir. 1992).  Although Dr. Albers' dismal assessment of Plaintiff's exertional limitations may have been a sufficient basis to reject *that portion* of Dr. Albers' opinion, it was not a proper reason for rejecting his opinion of Plaintiff's non-exertional limitations: a conclusion bolstered by the fact that *all four* of Plaintiff's treating physicians agreed that his non-exertional limitations left him unfit for work.  (*See* AR 18; *see also* 20 C.F.R. § 404.1527 (specifying that the weight given to a treating physician's opinion depends on whether it is consistent with medical findings and other evidence in the record).)  More importantly, a defect in the opinion of one treating physician is not a "legitimate" reason to reject the opinion of a different treating physician.  *Cf. Lester*, 81 F.3d at 830.  Thus, a flaw in Dr. Albers' assessment of Plaintiff's exertional limitations is not a valid reason for rejecting the opinions of Drs. Dimmick, Santoro, and Zachary, none of whom purported to assess his exertional capacities.  (*See* AR 194-96, 198-99, 223-25, 312-27.)

1    In the final analysis, it appears that the ALJ rejected the

2    treating physicians' opinions because they relied on subjective

3    symptom complaints from a claimant whose testimony had been found to

4    be not credible. (*See* AR 19.)  As explained above, the ALJ's analysis

5    of Plaintiff's credibility did not comport with *Smolen*.   That being

6    so, the Court finds that the ALJ's stated reasons for rejecting the

7    opinions of Plaintiff's treating physicians were not sufficiently

8    specific and legitimate.  *See Holohan*, 246 F.3d at 1202-03.

9    Accordingly, on remand the ALJ must make clear what weight he gives

10   the opinions of Plaintiff's treating physicians, and must offer clear

11   and convincing reasons if he rejects or discounts them.

12   C.   New And Material Evidence

13   Finally, Plaintiff argues that the Court must remand this matter

14   to permit the ALJ to consider "new and material evidence"--namely, the

15   record of a post-decision hospitalization in which medical staff

16   observed Plaintiff to have five to seven loose bowel movements on each

17   of the two mornings of his in-patient care. (*See* Joint Stip., Exh.

18   B.)  The Court concludes that the ALJ should consider this new

19   evidence before he reaches a post-remand decision.

20   Under 42 U.S.C. § 405(g), in determining whether to remand a case

21   in light of new evidence, "the court examines both whether the new

22   evidence is material to a disability determination and whether a

23   claimant has shown good cause for having failed to present the new

24   evidence to the ALJ earlier." *Mayes v. Massanari*, 276 F.3d 453, 461-

25   62 (9th Cir. 2001).  To be material under section 405(g), the new

26   evidence must bear "directly and substantially on the matter in

27   dispute." *Ward v. Schweiker*, 686 F.2d 762, 764 (9th Cir. 1982).

28   Additionally, a claimant must demonstrate a "reasonable possibility"

that the new evidence would have changed the outcome of the administrative hearing.  *See Booz v. Secretary of Health & Human Servs.*, 734 F.2d 1378, 1380-81 (9th Cir. 1983).

The "new and material" evidence to which Plaintiff alludes is a letter from Dr. Santoro dated October 18, 2004.  The body of that letter reads, in pertinent part:

> [Plaintiff] is under my care because of a history of chronic diarrhea, deemed secondary to [IBS].  Because of the severity and disabling nature of his condition, an impatient hospitalization occurred July 2004.  This was a 48 hour hospital stay.  During that hospitalization, a thorough evaluation [was performed], including laboratory data, imaging studies, and stool collection for stool weight, electrolytes and fat.  It should be noted that the blood work performed during his admission was normal.  There was no evidence of any inflammation or anemia.  An endocrine workup was performed, looking for any endocrine abnormalities that might be contributing to the diarrhea.  This was also negative.  [¶]  Stool cultures as well as O&P testing of the stool were all negative.  The stool was also tested for the presence of fat which would suggest malabsorption and this was normal.  The stool also was tested for magnesium content which would suggest surreptitious laxative use, and this was found to be normal without any evidence of that.  The stool weight was [. . .] within the normal range [. . . .]  However, on observation

1      from the Nursing Department, [Plaintiff] was found to have

2      five loose bowel movements on Friday and seven loose bowel

3      movements on his second day of hospitalization.

4 (*See* Joint Stip., Exh. B at 29.)  Dr. Santoro interpreted these

5 findings as "suggesting that [Plaintiff] had [IBS]."  (*See* Joint

6 Stip., Exh. B at 29.)

7      Because the Court already has determined that remand is necessary

8 to permit the ALJ to correct the substantive errors in his decision,

9 the Court need not reach the issue whether this new evidence would

10 require remand all by itself.  The Court observes, however, that even

11 if the legitimacy of the decision hinged on this issue alone, the

12 *Mayes* criteria for good cause and materiality are met and remand would

13 be necessary to permit the ALJ to consider this new evidence.

14      "To demonstrate good cause, the claimant must demonstrate that

15 the new evidence was unavailable earlier."  *See Mayes*, 276 F.3d at

16 463.  In this case, Plaintiff's hospitalization occurred seven months

17 *after* the ALJ rendered his decision.  (*See* AR 14-22; *see also* Joint

18 Stip., Exh. B at 29.)  He asserts--without contradiction--that "this

19 report was not available to be obtained previously because of the long

20 wait getting this 48 hour observation approved by [Plaintiff's]

21 medical insurance."  (*See* Joint Stip. at 23-24.)  This uncontradicted

22 assertion suffices to establish good cause.  *See Key v. Heckler*, 754

23 F.2d 1545, 1551 (9th Cir. 1985)("If new information surfaces after the

24 Secretary's final decision and the claimant could not have obtained

25 that evidence at the time of the administrative proceeding, the good

26 cause requirement is satisfied.").

27      The new evidence also is clearly material.  Evidence is material

28 if the claimant can demonstrate "that there is a reasonable

1   possibility that the new evidence would have changed the outcome of
2   the administrative hearing." *See Mayes*, 276 F.3d at 462 (citation and
3   internal quotation marks omitted).  In Plaintiff's case, the crux of
4   the ALJ's finding of non-disability was that--other than Plaintiff's
5   own testimony--there was no evidence that his symptoms were severe
6   enough to be disabling.  (*See* AR 18-19.)  It is not unreasonable to
7   assume that, armed with this evidence, the ALJ would have reached a
8   different result.  Thus, this evidence was material.

9        On remand, the ALJ must consider Dr. Santoro's letter of October
10  18, 2004.  Additionally, the ALJ must update the medical record and
11  consider any new evidence of Plaintiff's ability during the period in
12  which he was insured for DIB.

13  D.   Remand Is Appropriate

14       The determination whether to remand for further proceedings or
15  for payment of benefits lies within the discretion of the Court.
16  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  In most
17  circumstances in Social Security disability cases, remand is
18  appropriate.  *See Moisa v. Barnhart*, 367 F.3d 882, 886-87 (9th Cir.
19  2004).  Remand may be productive where additional proceedings can
20  remedy defects in the original administrative proceedings.  *See Celaya
21  v. Halter*, 332 F.3d 1177, 1184 (9th Cir. 2003).

22       In this case, as explained above, the ALJ did not offer
23  sufficiently specific, clear, and convincing reasons for rejecting
24  Plaintiff's testimony.  *See Drouin*, 966 F.2d at 1258.  This error was
25  compounded by the fact that the ALJ relied upon his faulty credibility
26  determination in rejecting the opinions of four treating physicians--
27  all of whom had opined that Plaintiff was disabled--without offering
28  clear and convincing reasons.  *See Holohan*, 246 F.3d at 1202-03.  The

31

1   ALJ compounded this error by ignoring lay witness testimony that
2   supported Plaintiff's subjective symptom complaints.  *See Nguyen*, 100
3   F.3d at 1467.  Because all of these errors implicated evidence of the
4   frequency of Plaintiff's uncontrollable bowel movements, and because
5   the ALJ's decision turned on the perceived absence of such evidence,
6   (*see* AR 18-19), the error cannot have been harmless.  *See Batson*, 359
7   F.3d at 1197.

8        Because of these errors, and because the ALJ's hypothetical
9   questions to the vocational expert were both imprecise and under-
10  inclusive of Plaintiff's non-exertional limitations, the Court is not
11  in a position to say with certainty whether the medical and other
12  evidence of record compels the conclusion that Plaintiff is totally
13  disabled from any work.  Thus, remand for an award of benefits is not
14  justified.  *See Harman v. Apfel*, 203 F.3d 1151, 1158 (9th Cir. 2000).
15  Remand is, therefore, necessary to enable the ALJ to render a new
16  decision.

17       On remand, the ALJ must do several things.  First, he must update
18  the medical record to include all available evidence, including Dr.
19  Santoro's letter of October 18, 2004.  On the basis of all of the
20  evidence of record, the ALJ must then re-assess Plaintiff's residual
21  functional capacity in light of both his exertional and non-exertional
22  limitations.  Although Plaintiff has not specifically challenged the
23  ALJ's assessment of his functional capacity, the parties appear to
24  agree--and the record reflects--that the ALJ did not state what
25  evidence, if any, he relied on to derive a working residual functional
26  capacity model.  (*See* Joint Stip. at 5-6, 8-9; *see also* AR 19-20.)
27  Although the impact of the ALJ's other errors meant that this
28  particular error was a non-factor in the Court's decision to remand

this time around, caution dictates that the error be rectified to avoid further proceedings. *See Ziegler v. Barnhart*, No. Civ. A. SA03CA1014-XR, 2005 WL 354033, at *4 (W.D. Tex. Jan. 12, 2005)(remanding for further proceedings where it was "unclear from the ALJ's decision what evidence was relied upon in making the determination as to the effect of the combination of Plaintiff's physical and mental limitations on her residual functional capacity.").

After updating the record and re-assessing Plaintiff's residual functional capacity, the ALJ must hold another hearing and elicit testimony from a vocational expert regarding Plaintiff's ability to return to his former work or perform other work in the national economy despite his non-exertional limitations.[10] This is necessary because, although the ALJ relied upon the vocational expert's testimony to find that Plaintiff could return to his prior work, (*see* AR 59), the hypothetical question that prompted this testimony was based on assumptions that ignored Plaintiff's non-exertional limitations. *See DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir.

---

[10]   *See Polny v. Bowen*, 864 F.2d 661, 663-64 (9th Cir. 1988) (noting that, if a claimant's non-exertional limitations are "in themselves enough to limit his range of work, the Grids do not apply, and the testimony of a vocational expert is required to identify specific jobs within the claimant's abilities"); *see also Holohan*, 246 F.3d at 1209 (observing that it is clear error for an ALJ to ignore a claimant's non-exertional limitations and rely on the Grids). At Step Five of the five-step sequential inquiry, the Agency bears the burden of proving that the claimant can perform "other jobs that exist in substantial numbers in the national economy." *Lewis v. Apfel*, 236 F.3d 503, 508 (9th Cir. 2001); *see also* 20 C.F.R. § 416.920(f). There are two ways for the Agency to meet this burden: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines, or "Grids." *See Tackett*, 180 F.3d at 1099; *see also* 20 C.F.R. pt. 404, subpt. P, app. 2.

33

1990)("If the hypothetical does not reflect all the claimant's
limitations, . . . the expert's testimony has no evidentiary value to
support a finding that the claimant can perform jobs in the national
economy."). Although the vocational expert later testified that a
person with the limitations set forth in the ALJ's second and third
hypothetical questions could not perform *any* work, (*see* AR 60-61),
these hypothetical questions were no better than the first, in that
they ignored the substantial evidence of record suggesting that
Plaintiff may have been capable of either: (1) performing substantial
gainful activity from his home; or (2) performing jobs outside the
home, provided his shift began after the brunt of his symptoms had
subsided sometime in the afternoon. (*See* AR 49, 113-24, 206, 248.)
Because the ALJ's second and third hypothetical questions ignored
substantial evidence that Plaintiff's limitations could permit him to
work from home or out of home later in the day, the evidence they
generated has no value. *Cf. id.* (noting that the Agency could not
later contend that an ALJ's hypothetical question to a vocational
expert "gave too liberal a description of the claimant's limitations,"
but only "*[a]s long as the hypothetical was supported by substantial
evidence*")(emphasis added).

     "[I]n cases where the vocational expert has failed to address a
claimant's limitations . . . we consistently have remanded for further
proceedings rather than payment of benefits." *See Bunnell v.
Barnhart*, 336 F.3d 1112, 1116 (9th Cir. 2003)(citation and internal
quotation marks omitted). On remand, therefore, the ALJ should ask
the vocational expert to opine as to the availability of jobs
(including Plaintiff's former work) allowing a (1) work-from-home
option; (2) a swing-shift schedule with whatever other accommodations

Plaintiff's late-day symptoms would require; or (3) some combination of the two.  To ensure that the record is complete, further testimony from Plaintiff and lay witnesses regarding the specific frequency and duration of his late-day IBS symptoms also should be elicited at that hearing.[11]

Finally, the ALJ must render a new decision.  In the new decision, the ALJ must, at a minimum, set forth that all of the evidence, including any lay testimony, was considered.  *See Nguyen*, 100 F.3d at 1467.  Given the centrality of Plaintiff's subjective symptom complaints, it is particularly important that the ALJ set forth clear reasons for his credibility findings in that decision,

---

[11]   A work-from-home option would appear to be ideal, insofar as such an option would permit Plaintiff "to take breaks whenever he would like to."  *See Novak v. Barnhart*, 180 F.Supp.2d 990, 998 (E.D. Wis. 2001)(internal quotation marks and ellipses omitted).  Work-from-home limitations are legitimate.  *See Zietz v. Sec. of Health & Human Servs.*, No. 84-0076-F, 1992 WL 485476, at *4 (D. Mass. Aug. 19, 1992)(affirming an ALJ's conclusion that an agoraphobic claimant was not disabled where, in response to a properly-worded hypothetical question, a vocational expert identified jobs the claimant could perform in her home).  Likewise, a claimant's limitations to particular work-shifts may be properly put to a vocational expert.  *See Bronson v. Barnhart*, No. Civ. A. 02-3724, 2003 WL 22016790, at *6 (E.D. Pa. June 9, 2003)(noting that, where a Plaintiff's sleep disorder would permit her to work the graveyard shift but at no other times of the day, the ALJ must ascertain the availability of nighttime work).  As should be obvious, a work-from-home or late-day shift option would require carefully-crafted hypothetical questions to the vocational expert.  *See id.; see also Novak*, 180 F.Supp.2d at 998 (noting the "substantial differences between the demands of working at home and those of working in a more conventional work setting such as a factory," and faulting the ALJ for "conclud[ing] that performing button assembly at home was interchangeable with doing it in a factory"); *Carter v. Heckler*, No. Civ. A. No. 85-4138, 1987 WL 4790, at *7 (E.D. Pa. March 3, 1987)(remanding to permit the ALJ to develop vocational expert testimony regarding "the feasibility of work at home for one of [the claimant's] limited physical but virtually unlimited mental capacity.").

providing specific, clear, and convincing reasons if he finds Plaintiff's testimony less than fully credible. *See Drouin*, 966 F.2d at 1258. Additionally, the ALJ must examine the treating physicians' opinions carefully and explain what weight, if any, he gives such opinions in reaching his post-remand decision. The ALJ must provide clear and convincing reasons if these opinions are rejected. *See Holohan*, 246 F.3d at 1202-03.

IV.

CONCLUSION

For all the foregoing reasons, the Agency's decision is reversed and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

IT IS SO ORDERED.

DATED:    February  15  , 2006.


_____/s/_____
PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-Soc Sec\CASTIGNETTI\Memo Opinion.wpd

36